**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| VELKIS JOHNSTON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-06-CV-313 |
| | § | |
| MULTIDATA SYSTEMS | § | |
| INTERNATIONAL CORP., | § | |
| MDS NORDIAN, INC., | § | |
| MDS (CANADA), INC., | § | |
| and MDS, INC., | § | |
| | § | |
| Defendants. | § | |

**ORDER DENYING DEFENDANT MULTIDATA SYSTEMS INTERNATIONAL**
**CORPORATION'S MOTION TO DISMISS FOR LACK OF PERSONAL**
**JURISDICTION AND BECAUSE PLAINTIFFS' CLAIMS ARE BARRED BY**
**DOCTRINES OF RES JUDICATA AND DIRECT ESTOPPEL AND DENYING THE**
**CANADIAN DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL**
**JURISDICTION, IMPROPER SERVICE OF PROCESS, IMPROPER VENUE, FORUM**
**NON CONVENIENS, AND BECAUSE PLAINTIFFS' CLAIMS ARE BARRED BY THE**
**DOCTRINES OF RES JUDICATA AND DIRECT ESTOPPEL**

Plaintiffs bring this action against Defendants Multidata Systems International Corporation

(MSIC), MDS Nordian, Inc, MDS (Canada), Inc., and MDS, Inc.[1] for personal injuries and deaths

resulting from allegedly defective radiation therapy products that were designed, manufactured,

tested, packaged, assembled, marketed, or sold by Defendants.  MSIC and each Canadian Defendant

filed Motions to Dismiss for Lack of Personal Jurisdiction.  Each Canadian Defendant filed a Motion

to Dismiss for Improper Service of Process and Improper Venue, and the Canadian Defendants filed

---

[1]MDS Nordian, Inc, MDS (Canada), Inc., and MDS, Inc. will be referred to collectively
as the "Canadian Defendants."

1

a Joint Motion to Dismiss for *Forum non Conveniens*.  All Defendants filed Motions to Dismiss Because Plaintiffs' Claims are Barred by Doctrines of *Res Judicata* and Direct Estoppel.  Plaintiffs filed Responses to all the Motions, and Defendants submitted Replies.  For the reasons articulated below, all of Defendants' Motions are **DENIED**.[2]

## I.  Background

### A.  Facts and Allegations

In 1992, Theratronics International Ltd. ("Theratronics"), a Canadian corporation, manufactured and sold a Theratron 780C Teletherapy Unit (the "Theratron Unit") to Promed S.A., a Panamanian corporation, for use in treating cancer patients at the Panamanian Institute of Oncology ("ION"), which is a hospital owned and operated by the Panamanian government.  CDIC, a Canadian corporation, owned all the stock in Theratronics.  In 1998, CDIC sold its Theratronics stock to MDS, Inc., which, in 1999, sold the shares to MDS Nordion, Inc.  Shortly thereafter, Theratron became an inactive corporation.  MDS Nordion, Inc. merged with MDS Pharma Services, Inc. to form MDS (Canada), Inc. on November 1, 2001, and MDS Nordion, Inc. ceased to exist as a separate corporate entity.[3]

The Theratron Unit is a cancer-treating radiation unit that delivers Cobalt radiation to cancer patients.  ION used the Theratron Unit in conjunction with a Treatment Planning System (TPS), which it purchased from MSIC, a Delaware corporation that is headquartered in St. Louis, Missouri.  TPS is a stand-alone computer and software system used to assist in calculating radiation dosages,

---

[2]The Court does not consider this Order worthy of publication.  Accordingly, it has not requested and does not authorize publication.

[3]MDS (Canada), Inc. operates an unincorporated division known as MDS Nordion.

distribution, and treatment times.

Plaintiffs are either cancer patients who received radiation treatment at ION in 2000 or are survivors of deceased patients treated at the same facility during the same time period. ION used the Theratron Unit to administer the treatment, and it used TPS to calculate dosages. Plaintiffs allege that the equipment ION used was defective and caused the patients to receive doses of 20%–200% above the prescribed levels of radiation. Plaintiffs claim that the excess radiation doses that were administered or calculated by the allegedly defective medical equipment resulted in serious injury or death.

Defendants claim that the over-radiation was caused by a misuse of TPS. According to Defendants, when a patient is treated with radiation, shielding blocks are commonly used to protect healthy organs and tissue in surrounding areas. For each patient, doctors and physicists calculate a treatment plan and determine a dosage that takes into account the shielding blocks. TPS was allegedly designed to determine dosage times based upon the size and position of *four* shielding blocks. According to the Canadian Defendants, on or about August 2000, a radiation oncologist at ION requested a treatment plan that used *five* shielding blocks. The Canadian Defendants claim that ION physicists manipulated the data entry procedure to accommodate five blocks and that the physicists would have discovered any errors in treatment dosage times if they had performed a manual verification of the results obtained from TPS—a procedure allegedly required by the applicable standard of care.

The Panamanian government, the International Atomic Energy Agency, and a group of

3

physicians and physicists from M.D. Anderson Cancer Center in Houston, Texas[4] investigated the facts surrounding the over-radiation.  As a result of the investigations, one of the radiation oncologists and all three physicists in the ION radiation oncology department lost their licenses to practice for life, and the three physicists were criminally convicted for negligent homicide.

*B.  Procedural History*

In October, 2001, several of the instant plaintiffs filed a lawsuit against MSIC and the Canadian Defendants in the Circuit Court for the County of St. Louis, Missouri for lost chance of recovery or survival, wrongful death, negligence, products liability, and punitive damages.  The Parties conducted discovery, and the defendants moved to dismiss the case for *forum non conveniens*.  While discovery was being conducted on the *forum non conveniens* issue in the Missouri case, one of the plaintiffs filed a lawsuit against some of the defendants in the San Miguelito Judicial District of Panama.  The San Miguelito court dismissed the case, and the defendants were never served.  The Canadian Defendants allege that the San Miguelito court dismissed the case because it was filed in the wrong venue.

The Missouri trial court conducted a three day evidentiary hearing and, on January 8, 2004, dismissed the action for *forum non conveniens*.  The case was dismissed without prejudice, and the trial judge, apparently taking the San Miguelito decision into account, instructed that

> [r]econsideration may be given to the refiling of this cause in this jurisdiction if a determination is made by a Panamanian court of competent jurisdiction and venue for this cause that jurisdiction does not exist in Panama and the Defendants were given the opportunity to submit to jurisdiction of the Panamanian court or were given notice

---

[4]Francisco Aguirre, M.S. medical physicist, Peter Almond, Ph.D. medical physicist, and Robert Lindberg, M.D. radiation oncologist, conducted a consultation visit to ION at the request of the Panamanian Ministry of Health.  They visited ION on April 17–18 and issued their Report on April 25, 2001.

of such filing so as to be able to present their position to the court on the issue of jurisdiction.

*Chandler v. Multidata Sys. Int'l Corp.*, No. 01CC-3634 (Mo. Cir. Ct. Jan. 8, 2004) (Canadian Defs.'

Mot. to Dismiss for Forum non Conveniens Ex. L.)

Plaintiffs appealed the Missouri trial court's Order dismissing the case on February 13, 2004. During this same time period, the Panamanian Court of Appeals was considering the San Miguelito decision. It affirmed said decision on April 15, 2004. The Panamanian appellate decision was appealed to the Panamanian Supreme Court, which issued an Order declining to hear the appeal, allegedly due to a procedural defect, on March 10, 2005. On May 10, 2005, the Missouri Court of Appeals affirmed the Missouri trial court's Order dismissing the Missouri case for *forum non conveniens*. *See Chandler v. Multidata Sys. Int'l Corp.*, 163 S.W.3d 537 (Mo. Ct. App. 2005).

Plaintiffs still desired to litigate the matter in Missouri. They claimed that the San Miguelito decision and its appellate rulings were evidence that Panama could not exercise jurisdiction over Defendants. They filed four new cases in the Circuit Court for the County of St. Louis based on this interpretation of the Panamanian litigation. Defendants moved to dismiss all four cases due to lack of jurisdiction and direct estoppel, claiming that Plaintiffs had not fully complied with the original circuit court ruling. The Missouri trial court ruled that

> Plaintiffs have not proven this cause cannot be litigated in Panama . . . [T]he law of the case doctrine herein, as well as, parts of the doctrine of res judicata apply to require plaintiffs to re-file these claims in Panama. If Panama refuses to proceed, the claims can be re-filed in Missouri.

*Navarro v. Multidata Sys. Int'l Corp.*, No. 05CC-003136 (Mo. Cir. Ct. Mar. 16, 2006) (Multidata

Systems International, Inc.'s Mot. to Dismiss for Lack of Personal Jurisdiction Ex. B).

Two months later, on May 15, 2006, the instant lawsuit was filed, asserting essentially the

5

same claims that were asserted in the Missouri actions.  Unfortunately, the filing of the instant case does not end the convoluted procedural history of this case.  On May 26, 2006, four of the plaintiffs herein filed a lawsuit in the Judicial District for Panama City against the instant defendants.  The Canadian Defendants claim that said filing "was not a good faith effort to follow the Order of the St. Louis County Court" because "a significant part of the new Panamanian Petition for damages argues that the Panamanian Courts lack jurisdiction."[5]  MDS, Inc.'s Mot. to Dismiss for Lack of Personal Jurisdiction at 6.  The Judicial District for Panama City dismissed the case on the day it was filed, and, contrary to the Missouri trial court's requirements, Defendants were unable to present their position on jurisdiction to the Panamanian court.

Defendants claim that Plaintiffs' claims in the instant action are barred by the doctrines of *res judicata* and direct estoppel.  The Canadian Defendants request that this Court, like the Missouri state court, dismiss this case based on the doctrine of *forum non conveniens*.  Both MSIC and the Canadian Defendants claim that this Court does not have *in personam* jurisdiction, and the Canadian Defendants additionally move for dismissal based on improper service of process and improper venue.

Plaintiffs argue that their instant claims are not barred by the doctrines of *res judicata* and direct estoppel because the Missouri state courts analyzed whether *Missouri* was a convenient forum—not *Texas*.  They also claim that Defendants have significant contacts with Texas and that the Court can therefore exercise general jurisdiction over them.  Finally, Plaintiffs claim that a

---

[5]Both MDS, Inc. and MSIC derogatorily discuss the second Panamanian Petition, but neither cites to an exhibit containing the Petition.  The Court is unwilling to waste judicial resources by perusing through the plethora of documents submitted in this cause to find said Petition, if it was even provided.  So, the Court cannot make any determinations regarding whether the second Panamanian Petition was submitted in good faith or bad faith.

dismissal under the doctrine of *forum non conveniens* is inappropriate because Panama is not an available and adequate forum.

The Court respectfully finds that it is not barred from retaining this case by *res judicata*, direct estoppel, or lack of personal jurisdiction.   Additionally, the Court exercises its significant discretion in *forum non conveniens* matters by declining to dismiss the case under said doctrine.   In the following Sections, the Court will first discuss the legal standard for each of Defendants' claims, then it will explain why it has rejected Defendants' arguments.

## II.  *Res Judicata* **and Direct Estoppel**

*A.  Legal Standard*

In the Fifth Circuit, an action is barred by the doctrine of *res judicata* if a prior suit involved the same cause of action, both suits involved the same parties, a final judgment on the merits was rendered in the prior case, and the judgment was rendered by a court of competent jurisdiction. *See Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 559 (5th Cir. 1983) (citing *Stevenson v. Int'l Paper Co.*, 516 F.2d 103, 108 (5th Cir. 1975)).

> The *res judicata* effect of a jurisdictional decision[, though not on the merits,] is more limited than its effect where the decision is on the merits, for it is not binding as to all matters which could have been raised.   But a non-merits judgment of this type, whether its abating effect be termed direct estoppel . . . or simple res judicata, is conclusive as to matters actually adjudged.

*Acree v. Air Line Pilots Ass'n*, 390 F.2d 199, 203 (5th Cir.), *cert. denied* 393 U.S. 852, 89 S. Ct. 88, 21 L. Ed. 2d 122 (1968).

*B.  Analysis*

In the instant case, Plaintiffs contend that their claim is not barred by *res judicata* or direct estoppel because the decision rendered in the Missouri action was based on the convenience of

7

judicial proceedings in Missouri.  Since this case is in Texas, not Missouri, the issue is necessarily different.  Defendants, of course, claim that the issue is the same and that this Court is precluded from retaining this case due to the Missouri state court dismissal.

     *1.* Villar

     MSIC claims that this case is analogous to this Court's decision in *Villar v. Crowley Maritime Corp.* (Texas *Villar*), 780 F. Supp. 1467 (S.D. Tex. 1992).  In *Villar*, the plaintiffs first filed a lawsuit in the United States District Court for the Northern District of California. *See id.* at 1471.  The federal court in California dismissed the plaintiffs' claim based on the doctrine of *forum non conveniens*. *See id.*  The Ninth Circuit affirmed the dismissal. *Villar v. Crowley Maritime Corp.* (California *Villar*), 728 F.2d 1478 (9th Cir. 1986).  The plaintiffs then filed an identical lawsuit in the California State Superior Court, which dismissed the case based on the *California* doctrine of *forum non conveniens*. *See* Texas *Villar*, 780 F. Supp. at 1472. The California Court of Appeals affirmed. *See id.*

     The *Villar* plaintiffs next filed their case in the District Court of Harris County, Texas.  The defendants removed the case to federal court and moved to dismiss the case based on *res judicata* and *forum non conveniens*.  So, the *Villar* plaintiffs, like the instant plaintiffs, were required to present arguments to this Court regarding why (1) their claim was not barred due to the previous *forum non conveniens* rulings; and (2) this court was a convenient forum even though the prior courts were determined to be inconvenient.

     The *Villar* plaintiffs were not successful.  This Court noted that a "forum non conveniens dismissal in one forum does not necessarily preclude the maintenance of an identical suit in another forum." Texas *Villar*, 780 F. Supp. at 1482 (citing *Mizokami Bros. v. Mobay Chem. Corp.*, 660 F.2d 712, 716–17 (8th Cir. 1981)).  However, the Court determined that, in the *Villar* circumstances, "the

California court's prior dismissal should be binding on this Court." *Id.*

The circumstances of that case vary substantially from the circumstances in the instant case. First, in *Villar*, "the California district court determined that a Philippine forum was more appropriate than an *American* forum, not just more appropriate than a *California* forum." *Id.* (emphasis added); *see also Villar v. Crowley Maritime Corp.*, 990 F.2d 1489, 1498 (5th Cir. 1993) ("The Ninth Circuit found that no forum in the United States was convenient."), *abrogated on other grounds by Marathon Oil Co. v. Ruhrgas*, 145 F.3d 211 (5th Cir. 1998)).   Here, the Missouri state court made no determinations regarding the whole of *America*.   Rather, it determined that a trial in Panama would be more convenient than a trial in *Missouri*.

Next, in *Villar*, the Court discussed the findings of the California *federal* court in its discussion of *res judicata*.   It did not discuss whether the findings of the California *state* court barred the claim.   Why?   Because the California state court made its determination that California was an inconvenient forum based on the *California* doctrine of *forum non conveniens*. *See id.* at 1472.   This Court and the California Federal District Court were both required to rely on the *federal forum non conveniens* doctrine. *See De Aguilar v. Boeing Co.*, 11 F.3d 55 (5th Cir. 1993) ("[F]ederal *forum non conveniens law* applies in federal district court."); *see also Villar*, 990 F.2d at 1498 ("The factors a [federal] district court must consider before dismissing a case based on *forum non conveniens* have not changed since the Ninth Circuit dismissed the Villars' case.").

In the instant case, the Missouri state court determined that Missouri was not a convenient forum based on the Missouri doctrine of *forum non conveniens*.   Missouri's *forum non conveniens* inquiry is not equivalent to the federal inquiry. *Compare Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268–69 & n.14 (5th Cir. 2001) (outlining the federal private and public interest factors), *with*

*Missouri ex rel. Chicago, Rock Island & Pac. R.R. Co. v. Riederer*, 454 S.W.2d 36, 39 (Mo. 1970) (en banc) (outlining the factors Missouri courts consider in a *forum non conveniens* analysis). *See also Chandler*, 163 S.W.3d at 545 (citing *Riederer* and listing the factors); MSIC's Mot. at 12 n.4 (discussing how the Missouri *forum non conveniens* analysis is similar to the factors considered in the second prong of a federal *personal jurisdiction* analysis).

The third distinction between *Villar* and the instant case is that, in *Villar*, the Court specifically noted that there was "absolutely nothing . . . to suggest that Texas is a more convenient forum than California." Texas *Villar*, 780 F. Supp. at 1482. Here, the evidence presented by Plaintiffs indicates that Texas is a more convenient forum for at least some of the witnesses (the investigators from Houston) than is Missouri.

   *2.* Torreblanca de Aguilar

MSIC next cites *Torreblanca de Aguilar v. Boeing Co.*, 806 F. Supp. 139 (E.D. Tex. 1992), for the proposition that the doctrine of direct estoppel prevents Plaintiffs from relitigating the *forum non conveniens* issue.   In *Torreblanca de Aguilar*, the Eastern District of Texas held that direct estoppel precluded the plaintiffs from relitigating the *forum non conveniens* issue when the claim filed in the Eastern District of Texas had previously been dismissed by a Washington state court based on the doctrine of *forum non conveniens*. *Torreblanca de Aguilar*, 806 F. Supp. at 142. The Eastern District, quoting *Villar*, noted:

> To avoid the preclusive effect of a prior *forum non conveniens* determination, "the plaintiff in the new forum must do more than ask for a rebalancing of *forum non conveniens* considerations underlying the previous consideration.   He must show objective facts relevant to the issue that materially alter the considerations underlying the previous resolution."

*Id.* at 141–42 (quoting Texas *Villar*, 780 F. Supp. at 1482 (quoting *Exxon Corp. v. Chick Kam Choo*,

817 F.2d 307, *rev'd*, 486 U.S. 140, 108, S. Ct. 1684, 100 L. Ed. 2d 127 (1988)).  The court found that,

like the *Villar* plaintiffs, the *Torreblanca de Aguilar* plaintiffs had not shown that the Eastern District

of Texas was more convenient than Washington.  In fact, the court found that Texas was a *less*

*convenient* forum than Washington. *See id.*  Again, in the instant case, Plaintiffs have presented facts

that indicate that this forum is more convenient than Missouri for some of the witnesses.

Additionally, the *Torreblanca de Aguilar* court found that it would simply be "rebalancing"

the same "objective facts" if it were to conduct another *forum non conveniens* inquiry.  In the instant

case, the same facts are not simply rebalanced because, as explained above, the facts considered in

the Missouri state *forum non conveniens* analysis and the federal *forum non conveniens* analysis are

different.

     *3.*  Pastewka *and* Mizokami Bros.

Two other cases cited by MSIC are worthy of discussion: *Pastewka v. Texaco, Inc.*, 565 F.2d

851 (3d Cir. 1977), and *Mizokami Brothers of Arizona*, 660 F.2d 712.  In each case, the plaintiffs re-

filed their case in a different federal court after another federal court had dismissed the case for *forum*

*non conveniens*.  Thus, in both cases, the original *forum non conveniens* decision was made by a

federal court using federal *forum non conveniens* factors.

In *Pastewka*, the Third Circuit determined that the plaintiffs in an action filed in the District

of Delaware were bound by the Southern District of New York's *forum non conveniens* decision.  The

Third Circuit explained that "[t]heir contention amounts to no more than a wish that, in applying

objective criteria to the undisputed facts, a different judge would make the discretionary forum non

conveniens determination." *Pastewka*, 565 F.2d at 854.  While Plaintiffs in the instant case may very

well be wishing that this Court makes a different determination than the Missouri state court, this

Court will *not* be making its determination based on identical objective criteria.

The Third Circuit distinguishes *Pastewka* from *Parsons v. Chesapeake & Ohio Ry. Co.*, a Supreme Court case that held that "a prior state court dismissal on the ground of forum non conveniens can never serve to divest a federal district judge of the discretionary power vested in him by Congress to rule upon a motion to transfer venue under § 1404(a)." *Parsons*, 375 U.S. 71, 73–74, 84 S. Ct. 185, 187, 11 L. Ed. 2d 137 (1963). The Third Circuit's reasoning for the distinction is helpful here. The Third Circuit contrasted the fact that the *Pastewka* plaintiffs "point to identical criteria and rely on identical material facts underlying the application of those criteria," with the Supreme Court's observation in *Parsons* that

> "[t]he discretionary determinations of both the state and federal courts in this case required, to be sure, evaluations of similar, but by no means identical, objective criteria. However, since the material facts underlying the application of these criteria in each forum were different in several respects, principles of res judicata are not applicable to the situation here presented."

*Pastewka*, 565 F.2d at 854 (quoting *Parsons*, 375 U.S. at 72–73, 84 S. Ct. at 186). Again, in the instant case, the Missouri criteria and the instant criteria, as well as the underlying facts, while perhaps similar, are "by no means identical, objective criteria."

In *Mizokami Brothers*, the Eighth Circuit, in contrast to the *Pastewka* court, ruled that the dismissal of a case by an Arizona Federal District Court for *forum non conveniens* did not preclude the plaintiffs from bringing their claim in a Missouri Federal District Court. *See Mizokami Bros.*, 660 F.2d at 716. It distinguished the case from *Pastewka*, finding that "[a]lthough the Missouri federal court must apply the same objective criteria, the underlying facts to be evaluated are distinct." *Id.* (citing 18 Wright & Cooper § 4456; *Parsons*, 375 U.S. at 72–73; and *Prack v. Weissinger*, 276 F.2d 446, 450 (4th Cir. 1960)). The Eighth Circuit pointed out that the *Pastewka* plaintiffs had conceded

that "both the objective legal criteria and the material facts underlying the application of those criteria were identical." *Id.* (citing *Pastewka*, 565 F.2d at 854). Conversely, the record in *Mizokami Brothers* "demonstrate[d] sufficient differences in underlying facts." *Id.* Ultimately, the *Mizokami Brothers* Court held that the Arizona "dismissal is conclusive . . . only as to availability of an Arizona forum. Further litigation on other procedural questions and the merits of the claim are not precluded."[6] *Id.* at 716–17 (citation omitted).

Thus, if one were to analyze this case relying solely on *Mizokami Brothers*, one could conclude, as Plaintiffs suggest, that the Missouri dismissal only precludes further litigation in *Missouri*. While such reliance is tempting, especially since the extensive discussion above would not have been necessary, the Court finds that, for policy reasons, *Mizokami Brothers* should not be applied so literally. If all a plaintiff has to do, if one U.S. district court dismisses its claim under the doctrine of *forum non conveniens*, is keep re-filing it in other U.S. district courts until one decides to retain the case, then the decision of the original federal court would be devalued, precious judicial resources would be wasted, and already costly litigation would become even more expensive. *See Pastewka*, 565 F.2d at 854. There is no doubt that such a result would encourage pernicious forum shopping. *Mizokami Brothers* should thus be confined to its facts. The *Mizokami Brothers* plaintiffs presented evidence that the contacts of the parties with Missouri and the convenience of the Missouri forum for several witnesses rendered the underlying facts sufficiently different from those explored

---

[6]For an interesting discussion regarding whether the Arizona federal court's decision to dismiss the case for *forum non conveniens* without considering a transfer under 28 U.S.C. § 1404 meant that the suit was not maintainable in any federal court, see *Mizokami Brothers*, 600 F.2d at 717 n.6.

by the Arizona court to merit conducting a new *forum non conveniens* analysis.[7] *See Mizokami Bros.*, 660 F.2d at 716.

In the instant case, like in *Mizokami Brothers*, the underlying considerations are different than those considered by the Missouri state court.   Furthermore, the general *forum non conveniens* considerations of Missouri state courts are different than the *forum non conveniens* factors considered by federal courts.   Therefore, neither direct estoppel nor *res judicata* apply, and Defendants' Motions to Dismiss under these theories are **DENIED**.

### III.  Personal Jurisdiction

Because the Court has determined that it is not barred from hearing this case as a consequence of the Missouri dismissals, it must now determine if it is jurisdictionally prohibited from hearing it. MSIC and the Canadian Defendants have each argued that they are not subject to personal jurisdiction in this Court.   After setting forth the legal standard for the exercise of personal jurisdiction, the Court will discuss each Defendant's connections to the state of Texas.

### A.  Legal Standard

Generally, the plaintiff bears the burden of establishing the Court's jurisdiction over a

---

[7]The *Mizokami Brothers* case was brought by Mizokami Brothers of Arizona ("Mizokami Brothers") against Mobay Chemical Corporation ("Mobay") for the recovery of monetary damages suffered by Mizokami Brothers when a shipment of Mexican-grown bell peppers were impounded by the Food and Drug Administration because the peppers contained residues of a chemical pesticide manufactured by Mobay. *Mizokami Bros.*, 660 F.2d at 714.   Several facts favored retention of the case in Missouri, including: (1) "Mobay manufactured a key ingredient of the insecticide at its plant in Missouri"; (2) Mobay employees lived in Missouri; (3) many corporate documents were found in Missouri; and (4) Mobay distributed literature about the pesticide in Missouri. *Id.* at 719.   The Eighth Circuit ultimately held that the Missouri District Court did not abuse its discretion by dismissing the case for *forum non conveniens*; however, the Eighth Circuit found that the dismissal should have been conditional and remanded the case to the district court, requiring it to consider transferring to another U.S. jurisdiction, or, if there were no appropriate U.S. forums, only dismissing the case under very specific conditions. *See id.*

nonresident defendant. *See Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994). However, it is sufficient for the plaintiff to make a *prima facie* showing of jurisdiction, and any conflicts between affidavits are resolved in favor of the plaintiff. *See Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 785 (5th Cir. 1990); *Guyton v. Pronav Ship Mgmt., Inc.*, 139 F. Supp. 2d 815, 818 (S.D. Tex. 2001). A nonresident defendant is subject to personal jurisdiction in this District if: (1) the defendant is amenable to service of process under Texas's long-arm statute; and (2) the exercise of personal jurisdiction over the defendant is consistent with due process. *See Stripling v. Jordan Prod. Co., L.L.C.*, 234 F.3d 863, 869 (5th Cir. 2000); *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992). The Texas long-arm statute grants jurisdiction over a nonresident defendant "doing business" in Texas. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). The phrase "doing business" has been interpreted to reach as far as the United States Constitution permits, and therefore the jurisdictional inquiry under the Texas long-arm statute collapses into a single due process inquiry. *See Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993); *Williams v. Castro*, 21 F. Supp. 2d 691, 692 (S.D. Tex. 1998); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356–57 (Tex. 1990). Whether the exercise of personal jurisdiction over a defendant is consistent with the Due Process Clause of the United States Constitution likewise requires a two-pronged inquiry. First, the Court must conclude that the defendant has "minimum contacts" with the forum state. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945). Second, the Court must determine whether requiring the defendant to litigate in this forum offends "traditional notions of fair play and substantial justice." *Id*; *see also Wilson*, 20 F.3d at 647; *Ruston Gas Turbines*, 9 F.3d at 418.

*1. Minimum Contacts*

15

The "minimum contacts" prong can be satisfied by finding either specific or general jurisdiction over a defendant. *See Wilson*, 20 F.3d at 647.  A defendant's limited contact with the forum state may support specific jurisdiction if such contacts give rise to the cause of action. *See Ruston Gas Turbines*, 9 F.3d at 419 ("A single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted.").

A defendant's contacts unrelated to the cause of action may confer general jurisdiction, but these contacts must be both "continuous and systematic" and "substantial." *Wilson*, 20 F.3d at 647, 650–51.  A defendant's contacts with the forum state may be deemed continuous, systematic, and substantial if the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985) (citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239–40, 2 L. Ed. 2d 1283 (1958)).  Such contacts need not exhibit a physical presence within the state, but they should be "such that [the defendant] should reasonably anticipate being haled into court there." *Id.* at 474–76, 105 S. Ct. at 2183–84 (citing *World-Wide Volkswagen Corp. v. Woodson*, 44 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 490 (1980)).

### 2.  Fair Play and Substantial Justice

The second prong of the due process inquiry requires the Court to determine whether the exercise of jurisdiction would violate "'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316, 66 S. Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 343, 85 L. Ed. 278 (1940)).  However, "where a defendant who purposely has directed his

activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184.  The Court may consider factors such as "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the  most efficient resolution of controversies,' and the 'shared interest of the several States in furthering substantive social policies.'" *Id.* (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S. Ct. at 564).  Occasionally, "these factors . . . serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.*

B.  *Analysis—MSIC*

Plaintiffs do not argue that this claim arises out of MSIC's contacts with Texas, so this discussion will be confined to whether this Court can exercise general jurisdiction over MSIC.

1.  *Minimum Contacts*

Plaintiffs claim that MSIC continuously and systematically conducted business within Texas during the five years prior to the events giving rise to this claim.  Plaintiffs present evidence that (1) MSIC sold over $130,000 worth of goods to Texas customers; (2) MSIC advertised in trade magazines that reach Texas; (3) MSIC's employees attended trade conventions in Texas; (4) MSIC entered into contracts with Texas customers that did not contain forum selection clauses; and (5) MSIC employees traveled to Texas to set up equipment.  MSIC also entered into agreements with its customers to send technicians to Texas to repair equipment if necessary.

MSIC does not contest the above-mentioned contacts.  Rather, MSIC contends that said contacts are not substantial enough to justify the exercise of general jurisdiction. *Jones*, 954 F.2d at

1068 ("The minimum contacts inquiry is broader and more demanding when general jurisdiction is alleged, requiring a showing of substantial activities in the forum state.").  MSIC compares its contacts to the contacts of defendants in three other cases in which the courts were unable to exercise personal jurisdiction over the defendants, and MSIC claims that it has fewer contacts than the defendants in those cases.

      *a.*  Helicopteros

In *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984), the defendant "sen[t] its chief executive officer to Houston for a contract-negotiation session; accept[ed] into its New York bank account checks drawn on a Houston bank; purchas[ed] helicopters, equipment, and training services from [a Texas manufacturer] for substantial sums; and sen[t] personnel to [that manufacturer's] facilities . . . for training." *Helicopteros*, 466 U.S. at 416, 104 S. Ct. at 1873.  Regarding the purchases and trips, the Supreme Court emphasized that "purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction." *Id.* at 417, 104 S. Ct. at 1874 (citing *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516, 43 S. Ct. 170, 67 L. Ed. 372 (1923)).

MSIC claims that the *Helicopteros* defendant's contacts with Texas were more significant than are its contacts.  MSIC concedes that it sold over $130,000 worth of equipment to Texas customers during the last five years, but it emphasizes that these sales only constitute about 3% of its total aggregate sales during those years.  In *Helicopteros*, the defendant purchased approximately 80% of its fleet from a Texas manufacturer. *Id.* at 411, 104 S. Ct. at 1870.

While the Court agrees that the percentages listed indicate that the *Helicopteros* defendant's contacts with Texas were a more substantial aspect of its overall business than are MSIC's, the Court

is more interested in the nature of the contacts than in how much Texas contributes to the business's overall profits.  *See Int'l Shoe*, 326 U.S. at 319, 66 S. Ct. at 160 ("Whether due process is satisfied must depend on the *quality and nature of the activity* in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." (emphasis added)).  In *Helicopteros*, the defendant *purchased* goods and services from a Texas corporation.  MSIC is *selling* goods and services to Texas companies.  While buying and selling are admittedly interrelated, they are not the same thing.  MSIC is actively entering Texas markets and selling goods to Texas companies, and Texas has a strong interest in ensuring that goods sold to its citizens are not dangerous.  Particularly when such goods are used by Texas medical facilities, where patients expect that their health will improve, not made worse by faulty medical equipment.

Additionally, the Court finds MSIC's argument that its sales should not be considered because they only constitute 3% of its aggregate sales unconvincing.  MSIC is an international corporation, and it sells its products to medical facilities throughout the world.  The idea that MSIC should not be held to answer in Texas for the large amount of equipment—and services—that it provides to Texas medical facilities just because it is able to sell more of its equipment to medical facilities in other states or countries than it does in Texas is completely unpersuasive.  The effects of MSIC's contacts on the health and welfare of Texas citizens are manifestly  more important in this Court's analysis than are the effects of Texas purchases on MSIC's bottom line.

> *b.*  Smirch

MSIC next claims that the defendant in *Smirch v. Allied Shipyard, Inc.*, had "exponentially more systematic and continuous" contacts with Texas than MSIC, yet this Court held that the *Smirch* defendant did not have sufficient contacts with Texas to justify the exercise of general jurisdiction.

19

*Smirch*, 164 F. Supp. 2d 903, 911 (S.D. Tex. 2001) (Kent, J.); MSIC's Reply at 3.  In *Smirch*, the defendant was a Louisiana corporation that had fifty customers with Texas addresses, had two "isolated trips" to Texas, various mailings to and from Texas, ownership in stock in two Texas companies, and "some vague recollection of being sued in Texas once before." *Smirch*, 164 F. Supp. 2d at 911.  The *Smirch* defendant repaired a vessel that was "owned by Texas residents and intended for use in Texas." *Id.*  The plaintiffs "sought [the] [d]efendant's services in Louisiana," and "retrieved the vessel following completion of the ship repairs in Louisiana." *Id.*

These contacts are not more continuous, systematic, and substantial than MSIC's contacts with Texas.  While the *Smirch* defendant's customer list included Texas customers, there was "no indication of whether or not [the defendant] conducted business *in* Texas." *Id.* (emphasis added).  The Court noted that the "[p]laintiffs do not aver . . . that [the defendant] executed contracts in Texas, performed services in Texas, delivered vessels in Texas, or other corroborating facts," and the plaintiffs' "client list is simply a list." *Id.*  In the instant case, the documentation presented by Plaintiffs is more than a mere list of Texas clients.  Plaintiffs' evidence indicates that MSIC actually traveled to Texas to install its hardware and possibly to provide repair services. Pls.' Resp. to MSIC's Mot. at 8–9 & Ex. A.

The additional *Smirch* contacts—two trips to Texas, mailings to and from Texas, ownership of shares of stock in Texas companies, and possibly being sued in Texas before—were "too insubstantial to satisfy the formidable threshold set forth in *Helicopteros*." *Id.*  MSIC's remaining contacts with Texas include advertisements, business trips, and contracts with Texas residents that did not contain forum selection clauses.  These contacts are of a completely different nature than the contacts listed in *Smirch*, and, thus, cannot be stacked one against the other.

20

*c.* Bearry

Finally, MSIC compares its contacts with the contacts of the defendant in *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir. 1987).  In *Bearry*, the Fifth Circuit concluded that Beech Aircraft Corp.'s ("Beech's") contacts with Texas did "not support a finding of continuous and systematic contacts on which general jurisdiction could be based." *Bearry*, 818 F.2d at 375.  During the five years prior to the *Bearry* litigation, Beech (1) sold $250 million worth of products to Texas dealers, who in turn sold the products to Texas citizens; (2) occasionally "visited the Texas dealers . . . to assist them with maintenance problems, to demonstrate new aircraft, and to offer sales incentives," "but only at a dealer's request;" and (3) "manufactured airframe assemblies for a Fort Worth company."[8] *Id.* at 373.  While these contacts at first blush seem significant compared to MSIC's contacts, upon further examination, MSIC's contacts are substantially more significant.

First, when one compares the $130,000 MSIC derived from its Texas business with the $250 million worth of products that Beech sold to Texas dealers, it seems that Beech was substantially more involved with Texas than MSIC.  This, however, like the percentage issue discussed above, amounts to a meaningless comparison of numbers.  While the Beech products were worth a lot monetarily, they are worthless in the general jurisdiction analysis.  *See World-Wide Volkswagen*, 444

---

[8]Beech also "engaged in a nation-wide marketing plan," which, of course, included Texas. *Bearry*, 818 F.2d at 373.  However, the Fifth Circuit ruled that Beech's nationwide advertising program did not support a finding of general jurisdiction. *See id.* at 376 (distinguishing *Bearry* from *Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166 (5th Cir. 1986), in which the Circuit considered Oreck's advertisements in trade magazines in its jurisdictional analysis, because the cause of action in *Oreck* arose from "the defendant's contacts with the forum").  It is unclear whether such advertising is irrelevant to a general jurisdiction analysis or just cannot justify the exercise of jurisdiction without other evidence of contacts with the forum.  In an abundance of caution, the Court will not consider the MSIC's trade magazine advertisements, which were not purposely directed at Texas, in the instant analysis.

U.S. at 299, 100 S. Ct. at 568 ("[F]inancial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State." (citation omitted)).  Beech sold the goods to *Texas dealers*, who sold the goods to Texas citizens.  Beech "carefully requir[ed] the negotiation, completion, and performance of all contracts in Kansas." *Bearry*, 818 F.2d at 376.  Beech itself conducted no sales in Texas, and the dealers' sales were not imputed to Beech. *See id.* at 372–73, 375 & n.2.  Beech, in fact, "structure[d] its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states such as Texas."[9] *Id.* at 375–76.

Beech also sold airframe assemblies under contracts exceeding $72 million to a corporation located in Texas.[10]  This sum is substantially greater than the $130,000 worth of medical equipment MSIC sold to Texas medical facilities.  However, the medical equipment, which was sold directly to Texas medical facilities and will potentially be used in the treatment of hundreds (or even thousands) of patients, has a more direct impact on Texas citizens than the airframe assemblies, which were used in aircraft that may not have even been sold to Texas citizens.  Furthermore, Beech shipped the airframe assemblies to the Texas corporation "F.O.B. Wichita" and "carefully require[d] the

---

[9]Beech also "purchased over $195 million of goods and services from over 500 Texas vendors." *Id.* at 373.  The Fifth Circuit did not consider this a substantial connection because Beech's purchases, like its sales, were "carefully negotiated in Kansas, with delivery of all goods accepted in Kansas." *Id.*

[10]MSIC claims that Beech "manufactured airframe assemblies in Fort Worth." MSIC's Reply at 3–4.  The Fifth Circuit, however, stated that "Beech . . . manufactured airframe assemblies for Bell Helicopters in Fort Worth, Texas, under contracts exceeding $72 million with all products delivered to Bell 'F.O.B. Wichita.'" *Bearry*, 818 F.2d at 373.  Thus, it seems the airframe assemblies were actually manufactured in Wichita and that "in Fort Worth" indicates the location of Bell Helicopters.  The fact that Beech delivered its products to Bell Helicopter "F.O.B. Wichita" is another example of how Beech structured its business operations to avoid the general jurisdiction of courts in other states.

negotiation, completion, and performance of all contracts in Kansas." *Id.* at 376.  MSIC did not merely ship its products from Missouri to Texas, insuring that ownership changed hands in Missouri. Instead, it at times traveled to Texas to install said equipment and offered other services to its Texas customers.  Thus, unlike Beech, MSIC did not ensure that it would not be subject to general jurisdiction of Texas courts by "carefully requiring the negotiation, completion, and performance of all contracts in [Missouri]." *Id.*  In fact, MSIC did not even include a forum selection clause in its contracts with Texas medical facilities.

The *Bearry* plaintiffs also pointed to Beech's occasionally "visit[ing] the Texas dealers . . . to assist them with maintenance problems, to demonstrate new aircraft, and to offer sales incentives," "but only at a dealer's request" as a substantial contact with Texas. *Id.* at 373.  The Fifth Circuit did not find such visits to be enough to justify exercising general jurisdiction.  In the instant case, MSIC sometimes provided installation and support services to its Texas customers.  MSIC's visits to Texas to provide such services indicate a much stronger connection with Texas than do Beech's "only-at-a-dealer's-request" visits.  This stronger connection becomes evident when one examines the contracts between MSIC and Texas medical facilities. *See* Pls.' Resp. to MSIC's Mot. Ex. A.  MSIC's contracts include an option for its buyers to purchase various "levels of support" for the equipment they purchased.  If the customer chooses the "standard multicare application support" plan, it is entitled to support via fax or telephone, updates, and tuition to attend one training session.  If the customer upgrades to the second level, it is entitled to "hardware repairs on exchange basis."  The third level, "premium multicare support," entitles the customer to "*on site* emergency repairs when needed, or for preventive maintenance." *Id.* (emphasis added).  In essence, through its contracts for the purchase of medical equipment, MSIC purposefully directed its "advertising" for these service agreements to

23

Texas residents—and, if purchased, said agreements further tied MSIC to Texas.

In sum, the contacts in *Helicopteros*, *Smirch*, and *Bearry* cannot be realistically compared to the instant case because the nature of MSIC's contacts with Texas are different than were the contacts of the defendants in those cases. The *Helicopteros* defendants *purchased* a substantial amount of goods from a corporation located in Texas, whereas MSIC *sold* goods and services to Texas medical facilities. The *Smirch* defendant's client list contained fifty names of Texas customers, but the *Smirch* plaintiffs did not present any corroborating evidence indicating that the defendant actually executed contracts, delivered products, or performed services in Texas. Here, Plaintiffs presented the Court with substantial documents indicating that MSIC employees traveled to Houston, Dallas, Bryan, and San Antonio; installed or offered to install equipment in Bryan and Abilene; and repaired or offered to repair software of equipment in Corpus Christi, Austin, and Carrollton. Pls.' Resp. to MSIC's Mot. at 8–9 & Ex. A. Finally, the *Bearry* contacts are distinguishable because the *Bearry* defendant purposely structured its business to avoid the jurisdiction of courts outside its home state, whereas here, MSIC purposely directed its service plans to its Texas customers, traveled to Texas to perform said services, and did not attempt to avoid Texas jurisdiction by including a forum selection clause in its contracts.

### 2. Fair Play and Substantial Justice

Now that the Court has established that MSIC has enough contacts with Texas to justify the exercise of general jurisdiction, the Court must determine whether such an exercise would offend traditional notions of fair play and substantial justice. The Court must consider "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the  most

efficient resolution of controversies,' and the 'shared interest of the several States in furthering substantive social policies.'" *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S. Ct. at 564).

MSIC argues that it is unfair to require it to travel to Texas to litigate this matter, stating that "it would be a tremendous burden on [MSIC] to litigate this case in a state where none of the acts giving rise to Plaintiffs' claims took place, no witnesses are located, and no evidence pertaining to the case can be found."[11] MSIC's Mot. at 13. The Court fails to fathom how traveling from Missouri to Texas is more burdensome than traveling to Panama. Regardless of where the case is tried, in an international dispute such as this, which involves parties or witnesses from Canada, Missouri, Texas, and Panama, counsel will inevitably be required to travel during the discovery phase of the litigation, anyway. Furthermore, MSIC had the opportunity to have the case heard in its home state, which would have required almost no travel to attend the trial, and instead chose to move for a *forum non conveniens* dismissal. It cannot now reasonably argue that traveling to Galveston, Texas, which is about 1000 miles from St. Louis, is overburdensome when it actually chose to, and is again requesting, to go to Panama, which is about 2000 miles and several countries removed from St. Louis, for the trial. As far as convenience to the Parties, since Texas appears to be somewhere in between Canada and Panama and since Missouri was unacceptable to MSIC, Texas is geographically as good a place as any to have this dispute settled.

Next, the Court considers Texas's interest in settling the dispute. MSIC argues that Texas has no interest in this suit. The Court respectfully but vigorously disagrees. As stated above, doctors or physicists from the world-renowned M.D. Anderson Cancer Center, which is located in the Southern

---

[11]The Court notes that there are, indeed, not only witnesses in Texas, but significant ones.

District of Texas, were asked to investigate the incident and will be witnesses at the trial. Undoubtedly, these professionals were chosen because M.D. Anderson is one of the best cancer hospitals in the world.  Texas citizens, like all people, are undoubtedly interested in cancer treatment, and M.D. Anderson's premier role in the field adds to that interest.  Even though the alleged over-radiation involved in this case did not occur in Texas, a case involving allegedly defective cancer treatment products manufactured by a company that sells cancer treatment products to Texas medical facilities and whose equipment was investigated by Texas doctors and physicists is of genuine and compelling interest to Texas citizens.

The Court next considers whether Plaintiffs' interest in obtaining convenient and effective relief weighs in favor of exercising personal jurisdiction over MSIC.  Plaintiffs are cancer patients who were injured at ION or legal survivors of deceased patients who received excessive amounts of radiation.  Most of the plaintiffs reside in Panama, though at least four plaintiffs are either U.S. citizens or permanent residents of the United States.  The Court finds that Plaintiffs have an unusually strong interest in obtaining convenient and effective relief. As discussed in the Procedural History section above, this case has been filed, dismissed, appealed, re-filed, and dismissed again in Missouri. It has also been filed and dismissed twice in Panama and has been appealed all the way to the Panamanian Supreme Court.  In the course of all of these filings, dismissals, and appeals, several of the over-radiated cancer patients have died.  And, it is indisputable that the remaining over-radiated cancer patients have a much higher probability of dying during the course of this litigation than a typical plaintiff.  It is due time for these patients to have their day in Court so they can benefit from

any award they may receive while they are still able to do so.[12]  Oppositely, Defendants are entitled to closure on as inexpensive, expeditious, and equitable bases as possible.

Next, the Court considers the interstate judicial system's interest in obtaining the most efficient resolution of controversies.  MSIC has not argued that it would be inefficient or a burden to the judicial system for this case to proceed in the Southern District of Texas, so the Court continues to the next factor.

The final fair play consideration is the shared interest of the several States in furthering substantive policies.  In an international dispute, the court should "consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction" of the court. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 115, 107 S. Ct. 1026, 1034 (1987).  Courts must exercise "'[g]reat care and reserve . . . when extending our notions of personal jurisdiction into the international field.'" *Id.* (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 404, 85 S. Ct. 528, 542, 13 L. Ed. 2d 365 (1965)).  In the instant case, two Panamanian courts, including the Panamanian court in the appropriate district, dismissed this case.  Since the Panamanian judicial system appears manifestly disinclined to exercise jurisdiction, it is unlikely that this Court's exercise of jurisdiction will offend it.[13]  Thus, this factor does not weigh for dismissal.

Therefore, upon weighing the second-prong factors, the Court finds that its retention of this case does not offend traditional notions of fair play and substantial justice.  No factor weighs against

---

[12]The Court acknowledges that some of the delay in this case is attributable to counsel who represents or represented Plaintiffs.  Under the facts of this case, the Court does not find it appropriate to hold the legal maneuvering of their counsel attributable to Plaintiffs.

[13]As discussed in the *forum non conveniens* section below, Panama is not, at this time, an available forum.

retention, and the Plaintiffs' need for an expeditious resolution of this matter weighs heavily in favor of retention.

Because MSIC has continuous, systematic, and substantial contacts with Texas and the exercise of general jurisdiction does not offend traditional notions of fair play and substantial justice, MSIC's Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED**.

*C. Analysis—Canadian Defendants*

*1. MDS Nordion, Inc.*

The Canadian Defendants claim, and Plaintiffs acknowledge, that MDS Nordion, Inc. is no longer a corporate entity. MDS (Canada), Inc. is the successor corporation, and all liabilities of MDS Nordion are now borne by MDS (Canada), Inc. Thus, the Court will consider MDS Nordion, Inc.'s contacts with Texas in its analysis regarding whether it may exercise personal jurisdiction over MDS (Canada), Inc.

*2. MDS (Canada), Inc.'s Contacts*

Plaintiffs claim that the Court may exercise general jurisdiction over MDS (Canada), Inc. because it, or its divisions, have continuous and systematic contacts with Texas. MDS (Canada), Inc. admits that it has contacts with Texas, but claims that the contacts listed by Plaintiffs do not amount to the type of continuous and systematic contacts necessary for the exercise of general jurisdiction. The Court must consider MDS (Canada), Inc.'s contacts with Texas "in toto," but, for illustration purposes, will discuss each in isolation, and then determine if, cumulatively, they are continuous, systematic, and substantial enough to justify the Court's exercise of general jurisdiction. *See Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 779 (5th Cir. 1986); *see also Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 717 (5th Cir. 1999).

28

First, Plaintiffs claim that MDS (Canada), Inc. contracts with and performs clinical trial work for Texas customers and that it solicits business from Texas companies for the provision of this clinical trial work.  MDS (Canada), Inc. acknowledges that it conducts clinical trial work for a "few Texas sponsors," but it claims that such work primarily involves logistical services to these sponsors and is extremely limited. MDS (Canada), Inc.'s Reply in Supp. of Its Am. Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2), (4), and (5) at 2.  It contends that the testing is done at its own facilities, which are not located in Texas, and that, as such, it has never established a physical business presence in Texas.  Furthermore, MDS (Canada), Inc. suggests that the clinical trial work does not constitute continuous and systematic contacts with Texas because it accounts for less than 1% of its total global revenue.

A "sponsor" is a pharmaceutical company for which MDS Pharma Services, a division of MDS (Canada), Inc., performs tests associated with clinical trial work.  The Court is unable to ascertain exactly how many Texas pharmaceutical companies have contracted with MDS Pharma Services.  Plaintiffs cite an exhibit that includes a list of numerous Texas companies, but MDS (Canada), Inc. claims that the cited material relates to its radiation delivery systems business, not its clinical trial work.  There are no titles on the documents.  Plaintiffs have the burden of proof on this issue, and they have failed to prove that the documents cited are lists of sponsors.  Thus, while the Court considers the contracts that MDS Pharma Services has with its Texas sponsors as contacts with Texas, the Court weighs such contacts as if they were with a *few* Texas sponsors–which has been admitted by MDS (Canada), Inc.

Plaintiffs claim that MDS Pharma Services also solicits business from Texas pharmaceutical companies for the performance of clinical trial work, and they cite Plaintiffs' Exhibit 30 for this

29

proposition.  Exhibit 30 does not contain a title.  However, it lists numerous Texas pharmaceutical companies, and, in several places, it contains a listed "quote price" for each company.  MDS (Canada), Inc. does not deny that MDS Pharma Services solicited business from these companies.  Thus, the Court finds that MDS Pharma Services solicited business from companies in El Paso, Commerce, Sherman, Smithville, College Station, Odessa, Amarillo, Fort Worth, San Antonio, The Woodlands, Houston, Dallas, McAllen, Bedford, Lubbock, Tyler, Austin, and Galveston.

Next, Plaintiffs claim that MDS Nordion, a division of MDS (Canada), Inc., maintains a Texas Radioactive Material License, which allows it to receive, acquire, process, and transfer radioactive material in Texas.  MDS (Canada), Inc. contends that its license, which merely *allows* it to conduct business in Texas, does not indicate that it has any contact with Texas residents.  The Court notes that MDS Nordion must have had some contact with the State of Texas when it applied for the license.  Furthermore, as discussed above, the Court is as concerned with the nature of contacts as with the amount.  While MDS Nordion's maintenance of the license does not prove that it has used it, it does suggest that it must at least *hope* to retain contracts to deal with radioactive materials in Texas.  The fact that MDS Nordion is (and was) purposely directing its activities in the hopes of dealing with radioactive material within this State is significant.  So, while the Court agrees that the license, standing alone, is not enough to satisfy Plaintiffs' minimum contacts' burden, the contact required to obtain the license and the inference that MDS Nordion, by holding and maintaining the license, is purposely directing its business toward Texas, strengthens the other evidence.

Plaintiffs next notes that MDS (Canada), Inc. sells million of dollars worth of radiation delivery systems to Texas customers, shipping them "F.O.B. destination."  MDS (Canada), Inc. claims that these sales are insufficient to show continuous and systematic contacts and that they

30

constitute an extremely small percentage of its overall revenue for its global sales.[14]  As discussed

above in the section discussing MSIC's contacts with Texas, however, the relative percentage of

profits received from MDS (Canada), Inc.'s Texas business has little significance in the minimum

contacts analysis when one takes into account the global nature of MDS (Canada), Inc.'s business.

Because MDS (Canada), Inc. has a worldwide market, the percentage of business in any single locale

will likely be small.  This small percentage in no way limits the fact that MDS (Canada), Inc. pursued

business in Texas and directly sold its equipment to Texas customers.

The sales in this case are unlike the sales in *Bearry*, which the Fifth Circuit determined were

insufficient to allow the exercise of general jurisdiction.  *See Bearry*, 818 F.2d at 376.  In *Bearry*, the

defendant purposefully structured its sales contracts so as to avoid Texas jurisdiction.  All contracts

were negotiated and executed in Kansas, and all products were shipped "F.O.B. Kansas." *See id.*

Here, MDS Nordion shipped its products "F.O.B. Texas."  While the Court is not unduly influenced

by the technicalities of when the transfer of ownership took place, the shipment method does indicate

that MDS Nordion, unlike the *Bearry* defendant, did not purposely structure its transactions with its

Texas customers to avoid Texas jurisdiction. *Compare Oswalt v. Scripto, Inc.*, 616 F.2d 191, 197 n.8

---

[14]MDS (Canada), Inc. cites *Access Telecom*, claiming that its Texas sales pale in
comparison to the billions of dollars received from Texas by the defendant in that case. *See
Access Telecom*, 197 F.3d at 717.  In *Access Telecom*, one of the defendants was a Mexican
telephone company that leased lines running from Mexico into border states to American
telephone companies, as well as leasing telephone circuits between Arizona and Texas.  The
purpose of the Mexican telephone company's contacts with the border states was to effectuate the
*Mexican* leg of telephone calls, and the money received from U.S. companies was "for service on
the Mexican leg of the call." *Id.*  Thus, the Fifth Circuit determined that the Mexican phone
company was "doing business *with* Texas," not "doing business *in* Texas." *Id.*  Essentially, the
funds received were for services performed in Mexico.  The funds received in the instant case
were for equipment that was shipped *to* and used *in* Texas, so it is not analogous to *Access
Telecom*.

(5th Cir. 1980) ("We note that jurisdiction does not depend on the technicalities of when title passes."), *with Gulf Consol. Servs. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1073 (5th Cir. 1990) (acknowledging that "the simple fact that a sales transaction is consummated outside that jurisdiction does not prevent the sale from forming the basis of jurisdiction," but finding that "a party can, through its actions, avoid being haled into a foreign jurisdiction")*; and Bearry*, 818 F.2d at 376 (reiterating that "technicalities" such as the structure of business transactions is "relevant in anlayzing general personal jurisdiction questions"). Thus, the sales are properly included as "contacts" in the Court's analysis.

MDS (Canada), Inc., through its MDS Pharma Services division, purchases supplies from vendors in Sweetwater and San Antonio. MDS (Canada), Inc. claims that these purchases are negligible. In *Helicopteros*, the Supreme Court instructed that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 418, 104 S. Ct. at 1874. Here, the purchases Plaintiffs point to are insubstantial in comparison with the purchases discussed in *Helicopteros*. Thus, the Texas contacts required for these purchases are of minimal consequence in the instant minimum contacts analysis.

Next, Plaintiffs contend that MDS (Canada), Inc.'s employees make regular trips to Texas for service and installation work. For example, in 2006, MDS (Canada), Inc. employees made between 13 and 17 such trips. MDS (Canada), Inc., citing *Helicopteros*, strenuously argues that the total number of business trips its employees make to Texas is extremely limited and should not be considered in the minimum contacts analysis. If the nature of the trips were consistent with the *Helicopteros* trips, the Court would agree with MDS (Canada), Inc.'s assertion. However, in

*Helicopteros*, the Supreme Court held that sending employees to Texas to *receive training* did not

"enhance[] the nature of [the defendant's] contacts with Texas." *Helicopteros*, 466 U.S. at 418, 104

S. Ct. at 1874.  Here, MDS (Canada), Inc. sent employees to Texas to *perform service and installation*

*work*.  Such visits are in no way analogous to sending employees to Texas to receive training, *see id.*,

or purchase goods, *see Rosenberg Bros.*, 260 U.S. at 518, 43 S. Ct. at 171 (finding that visits to New

York to purchase goods did not "warrant the inference that the corporation was present within the

jurisdiction of the state").

Likewise, the trips in the instant case cannot be compared to the trips to Texas taken in

*Bearry*, during which the defendant's representatives visited the independent dealers who sold its

products in Texas "to assist them with maintenance problems, to demonstrate new aircraft, and to

offer sales incentives." *Bearry*, 818 F.2d at 373.  While the *Bearry* Court does not discuss how the

defendant "assisted" these independent dealers with maintenance problems, this Court presumes,

given the context of the discussion, that such assistance did not rise to the level of performing

preventative maintenance or repairs–especially since the independent dealers were merely selling

Beech products, not using them.  Here, MDS (Canada), Inc. sent its employees to Texas, and said

employees performed services in Texas for customers who were using or going to use the equipment.

*See* MDS (Canada), Inc.'s Mot. to Dismiss Ex. 15 (listing the trips MDS Nordion Technical Services

made to Texas in 2006, which include nine billed service calls).  While these trips, standing alone,

may not be sufficient to constitute the exercise of general jurisdiction, they weigh into the analysis.

Plaintiffs next present evidence that MDS Nordion  has an employee who is a Texas resident

and performs work on MDS Nordion products *in* Texas.  MDS (Canada), Inc. claims that MDS

Nordion is an affiliate[15] of MDS (Canada), Inc. and that, as such, the Texas employee is not its

employee.  *See* MDS (Canada), Inc.'s Reply at 5.  The Court has not been informed as to the

intricacies of the business relationship and is therefore unable to definitively state that the Texas

employee should be considered an employee of MDS (Canada), Inc., but Plaintiffs are only required

to present a *prima facie* showing of MDS (Canada), Inc.'s contacts to fulfill their burden.  Because,

generally, "'[a] division of a corporation is not a separate legal entity but the corporation itself,'" *W.*

*Beef, Inc. v. Compton Inv. Co.*, 611 F.2d 587, 591 (5th Cir. 1980) (quoting *Stotter & Co. v. Amstar*

*Corp.*, 579 F.2d 13, 18 (3d Cir. 1978)); *see also N. Natural Gas Corp. v. Vandenburg*, 785 S.W.2d

415 (Tex. App.—Amarillo 1990, no writ) (quoting the same language), showing that the Texas

employee is employed by a *division* of MDS (Canada), Inc. fulfills Plaintiffs' *prima facie* burden.

Thus, the Court will consider the employment of a Texas resident as being a contact with Texas.[16]

Plaintiffs' final contention is that MDS (Canada), Inc. has a significant connection to Texas

because it, through MDS Pharma Services, invokes Texas law and jurisdiction in its contracts with

Texas companies.  MDS (Canada), Inc. claims that these contractual provisions are "of little

relevance . . . under the appropriate general jurisdiction analysis." MDS (Canada), Inc.'s Reply at 5.

---

[15]In its original Motion, MDS (Canada) Inc. claims that it "operates an unincorporated
division known as MDS Nordion." MDS (Canada) Inc.'s Mot. to Dismiss for Lack of Personal
Jurisdiction at 4.
   Interestingly, MDS (Canada) Inc. does not attempt to disassociate itself from MDS
Nordion in its discussion regarding any of the other alleged contacts the Plaintiffs attribute to
MDS (Canada) Inc. through MDS Nordion.

[16]The Court does not find MDS (Canada), Inc.'s argument that the Texas employee
should not be a significant consideration because he works out of his home, not an office, and
performs a substantial amount of his work outside of Texas persuasive.  The fact that MDS
(Canada), Inc.'s division has an employee who lives in Texas and performs *some* work in Texas
is indicative of a significant connection to Texas.

MDS (Canada), Inc. reiterates its argument that its contracts with Texas entities account for an extremely small percentage of its global revenue, and, as such, the invocation of Texas law in this small percentage of its overall contracts is insignificant. Regardless, such contractual provisions are an "invo[cation of] the benefit and protection of [Texas] law." *Burger King Corp. v. Rudzewicz*, 471 U.S. at 475, 105 S. Ct. at 2183. Accordingly, the Court finds that MDS Pharma Services "purposefully avail[ed] itself of the privilege of conducting activities within [Texas]." *Id.* Thus, said contractual provisions are contacts that the Court considers in its *in toto* jurisdictional analysis.

In sum, MDS (Canada), Inc., either on its own or though its divisions, (1) provides clinical trial work testing for a few Texas sponsors; (2) solicits business with companies throughout the State; (3) maintains a Texas Radioactive Material License; (4) sells radiation delivery systems to Texas customers without purposefully structuring the transactions so as to avoid Texas jurisdiction; (5) sends its employees to Texas to service equipment; (6) has an employee who lives in and performs work in Texas; and (7) invokes Texas jurisdiction in its contracts with Texas companies. All of these contacts, in accordance with the discussion above, bear at least some weight in the general jurisdiction analysis. Taken *in toto*, these contacts are substantial, continuous, and systematic.

### 3. MDS, Inc.'s Contacts

MDS, Inc. has various contacts with Texas including the following:(1) MDS, Inc. purchased over $5.2 million worth of goods from Texas vendors over the past five years; (2) MDS, Inc. is a party to a Hosting Services Agreement and a Software Licensing Agreement with a Texas company, and these contracts indicate that Texas law governs; (3) it employs two Texas residents who perform work for MDS, Inc. from their Texas homes; and (4) a former MDS, Inc. corporate director lives in Texas. First, MDS, Inc. claims that its purchases amount to doing business with Texas, not in Texas, *see*

*Access Telecom*, 197 F.3d at 717, and are not substantial enough to constitute continuous and systematic contacts. As stated in the previous analyses, the *Helicopteros* Court instructed that such purchases, standing alone, are not sufficient to maintain *in personam* jurisdiction. *See Helicopteros*, 466 U.S. at 417, 104 S. Ct. at 1873–74 ("[P]urchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction."). Thus, the purchases have a minimal impact on the Court's analysis.

MDS, Inc. next takes issue with Plaintiffs' assertion that it signed contracts with two Texas companies that had Texas choice of law clauses. One contract, a Hosting Services Agreement, contained an addendum that changed the governing law from Texas to New York. This addendum is evidence that MDS, Inc. was purposefully structuring its business dealings, at least regarding this contract, to avoid Texas law and possibly Texas jurisdiction. The Hosting Services Agreement also contained a Software Licensing Agreement that MDS, Inc. claims was not signed. The Software Licensing Agreement included clauses requiring both Texas law and a Texas forum. The second MDS, Inc. contract containing a Texas choice of law clause was with a Texas company that sells software for SEC filings. The forum selection clauses and governing law provisions in software licensing agreements are generally boilerplate and not negotiated. Thus, the Court finds that any contact with Texas that can be inferred from the governing law clauses or forum selection clauses in these two contracts was "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S. Ct. 1473, 1478, 79 L. Ed. 2d 790 (1984).

MDS, Inc. next argues that its Texas employees do not provide continuous and systematic contacts with Texas because they perform work for the Canada office, not a Texas office. However, these employees perform said work *in* Texas. One of the employee's work involves product

36

development and research, and the other employee is a software developer. Since they are Texas residents, MDS, Inc.'s contacts with them are contacts with Texas.

Plaintiffs' final allegation is that MDS, Inc. has substantial contacts with Texas because a former MDS, Inc. director lived in Texas while serving as an MDS, Inc. director. MDS, Inc. claims that, under *Holt Oil & Gas Corp.*, the fact that one of their former directors lived in Texas during his tenure is not enough to evoke minimum contacts. *See Holt Oil & Gas Corp.*, 801 F.2d at 779 (finding that the defendant's position as a director of a Texas corporation, standing alone, was insufficient to support general jurisdiction). MDS, Inc.'s argument fails. The defendant in *Holt Oil & Gas Corp.* was a director of a Texas corporation; here, a Texas resident is a director of the defendant's corporation. Obviously, just because both portions of the previous sentence have the same words, the rearrangement of the words gives each scenario a completely different meaning, making the instant case inapposite. Furthermore, the *Holt Oil & Gas Corp.* Court held that the defendant's status would not "alone be sufficient." *Id.* The Fifth Circuit then explained that "[d]etermining the existence of personal jurisdiction does not, however, involve an examination of each of [the defendant's] contacts with Texas viewed in isolation from one another." *Id.* Thus, if the residence of the director alone was not enough to sustain jurisdiction, it could (and should) still weigh into the total analysis.

The circumstances surrounding the former director's residency and directorship are necessarily part of the determination as to how much weight this factor bears. If the director was appointed before he moved to Texas and happened to move to Texas for some unrelated reason, then the contact MDS, Inc. had with Texas relating to that director would be "random," "fortuitous," or "attenuated." *See id.* However, if MDS, Inc. sought this specific director out because it desired to have a Texas director, then it unquestionably purposefully directed its actions at Texas, and the residency of the

37

director would bear significant weight.  The evidence indicates that the latter scenario is more accurate in this case. *See* Pls.' Resp. to Canadian Defs.' Mot. to Dismiss for Lack of Jurisdiction Ex. 14 (listing two addresses—an original and a change of address, both of which are in Houston—for the Texas director, and indicating that his directorship was effective on March 30, 2005), Ex. A at 47 (explaining that the Houston director had not been with the company very long and had retired in December 2006).  When asked why a person in Houston, Texas was "hired or asked to serve on the board," MDS, Inc.'s Vice President of Corporate Finance and Treasurer testified: "I can't speak to that.  I was not involved in the recruitment process." *Id.* Ex. A at 47.  Thus, there is no evidence regarding the actual recruitment involved in hiring the Texas director, but there is evidence that MDS, Inc. directors are hired via *recruitment* and that this director lived in Texas when he was hired. Plaintiffs have thus satisfied their *prima facie* burden on showing that MDS, Inc.'s contact with the former director residing in Texas is, indeed, a contact with Texas, and it is not merely a fortuitous contact.

Plaintiffs are required to make a *prima facie* showing that the Court may exercise *in personam* jurisdiction over each defendant.  Here, Plaintiffs clearly met their *prima facie* burden for the assertion of personal jurisdiction over MSIC and MDS (Canada), Inc.  MDS, Inc. presents a closer call.  However, the Court is convinced that MDS, Inc.'s contacts with its two Texas employees who work *in* Texas and its recruitment and hiring of a corporate director who lived in Texas, are sufficient contacts with the State to constitute the exertion of *in personam* jurisdiction.

### 4. *Fair Play and Substantial Justice*

The next step in the jurisdictional analysis requires the Court to determine whether exercising personal jurisdiction will offend traditional notions of fair play and substantial justice.  The Canadian

Defendants claim that the burden of defending this case is Texas is significant and that holding trial in Texas is inefficient.  Plaintiffs claim that the Canadian Defendants purposefully and intentionally established a continuous business presence in Texas and therefore cannot be unfairly surprised or unduly burdened by being haled into a Texas court.

The Court finds that the burden upon the Canadian Defendants of having the trial in Texas is not substantial enough to cause Due Process concerns.  The Court has assiduously examined the burdens claimed by the Canadian Defendants because the Supreme Court instructs that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114, 107 S. Ct. at 1033.  In *Asahi*, the burdens on Third-Party Defendant Asahi Metal Industry Co. ("Asahi") were substantial.  Third-Party Plaintiff Cheng Shin Rubber Industrial Co. ("Cheng Shin"), a Taiwanese company, was seeking indemnification from Asahi, a Japanese company, in California.  Both parties would have been required to travel substantially further to litigate in California than they would if the trial were held in Taiwan or Japan.  In the instant case, a dismissal would actually result in an increased travel burden for the Canadian Defendants.

In addition to its concerns about requiring Taiwanese and Japanese parties to travel to the United States when a local trial would be more geographically convenient, the Supreme Court determined that the interests of the plaintiff and the forum in having the trial in California were slight. *See id.*  The plaintiff was no longer a party to the action, and the Supreme Court noted that Cheng Shin did not demonstrate that California was a more convenient forum for the indemnification claim. *See id.*  Here, Plaintiffs have demonstrated that Texas is a more convenient forum than Panama City

for some of the plaintiffs, namely, those that live in the United States.  The Court realizes that Panama City is a more convenient for most of the plaintiffs, but, the plaintiffs chose this forum.  Thus, they have more than a "slight" interest in having their case heard here.  And, as noted above in the discussion of whether exerting jurisdiction over MSIC offend traditional notions of fair play and substantial justice, Plaintiffs have a *strong* interest in having their case heard expeditiously.

The *Asahi* Court found that "California's legitimate interests in the dispute [were] considerably diminished" because Cheng Shin did not reside in California. *Id.* While some of the instant plaintiffs live in the United States, none of them reside in Texas.  This fact, while diminishing Texas's interest, does not altogether destroy it.  In *Asahi*, the California Supreme Court argued that even though the parties did not reside in California, "the State had an interest in 'protecting its consumers by ensuring that foreign manufacturers comply with the state's safety standards.'" *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Court of California*, 702 P.2d 543, 550 (Ca. 1985)).  The Supreme Court eschewed this argument because "the dispute between Cheng Shin and Asahi [wa]s primarily about indemnification rather than safety standards." *Id.* at 114–15, 107 S. Ct. at 1033.  Asahi manufactured valve stems that were used in the tires Cheng Shin manufactured.  These tires were used in California, and the injury that instigated the litigation was allegedly the result of a defective tire, tube, and sealant.  *See id.* at 106, 107 S. Ct. at 1029.  The Supreme Court reasoned that "[t]he possibility of being haled into a California court as a result of an accident involving Asahi's components undoubtedly creates an additional deterrent to the manufacture of unsafe components; however, similar pressures will be placed on Asahi by the purchasers of its components as long as those who use Asahi components in their final products, and sell those products in California, are subject to the application of California tort law." *Id.* at 115, 107 S. Ct. at 1033.  Here, the Canadian

Defendants are not merely selling *components* that eventually end up in Texas.  They are selling medical equipment directly to Texas medical facilities and servicing that equipment in Texas.[17]  As discussed above in the discussion regarding MSIC, Texas has a substantial interest in the safety of this equipment.

The Canadian Defendants additionally complain that maintaining the case in this forum would be unfair because many Panamanian witnesses whose testimony is essential to the resolution of this controversy are beyond this Court's subpoena power.  While the Court understands the Canadian Defendants' concerns, it is not altogether convinced that the Canadian Defendants are not overstating the extent to which the witnesses it claims it will rely upon are necessary to the outcome of this case.  The case at hand is essentially a products liability action, so the most relevant testimony will be from experts.  The Canadian Defendants claim that, if the trial were held in Galveston, they would be unable to procure testimony from the current treating physicians, the doctors, nurses, and physicists who provided the treatment in question, family members, neighbors, the government employees who investigated the incident, and the ION employees who maintained and serviced the machine. *See* MDS, Inc.'s Mot. to Dismiss for Lack of Personal Jurisdiction at 13.  First, the Court notes that Plaintiffs should be able to adequately preserve and present the testimony of their current treating physicians and family members.  If the Canadian Defendants have difficulty obtaining testimony from the necessary physicians or family members, they should immediately inform the Court, and, if it finds such inability inhibits the Canadian Defendants' ability to adequately present a defense, it will

---

[17]The same distinction can be made in regard to Beech's "injection of commerce into Texas" in *Bearry. Bearry*, 818 F.2d at 377.  Beech was selling products to Texas dealers, who, in turn, sold the products to consumers. *Id.*  It was not directly selling its products to Texas consumers.

take appropriate action at that time.  Second, the doctors and physicists who provided the treatment in question have already been prosecuted in Panama, several civil investigations have been conducted, and reports have been issued, so there should be ample evidence available regarding their role in this affair.  These reports should also nullify the need for the testimony of the ION employees who maintained the equipment. Additionally, the Panamanian investigators should not be essential, since the Panamanian government requested the assistance of the four *Houston* investigators, who are well within this Court's subpoena power. Testimony of several investigators who investigated the same incident would be cumulative, and the Court frowns upon cumulative testimony, which wastes the Court's times, the witnesses' time, and the jurors' time.  Again, if the Canadian Defendants find that, for some reason, the information needed for an adequate defense is not available in the reports they are able to obtain, and deposing the Houston investigators does not remedy the situation, then they should immediately inform the Court.

The Canadian Defendants next argue that "virtually all the relevant documents are in Panama." *Id.* at 13–14.  This is an overstatement.  First, there is an extremely high probability that all the documents relating to the design and production of the equipment in question are in Canada and Missouri, where the equipment was designed, manufactured, and initially tested—not Panama. And, all the documents related to the investigation conducted by the Houston investigators are likely in Houston.  Second, the Court, which is located in Galveston, not Panama, is in possession of more than *four boxes* of exhibits that are relevant to this case.  These four boxes are merely the documents relevant to these Motions, so assuredly the Parties are in possession of even more evidence.  Granted, there are likely some relevant documents that are still in Panama and have not been produced, but, considering the discovery that has been conducted in the course of the almost six years since this case

42

was originally filed in St. Louis, Missouri, the Court is unconvinced that any significant relevant documents have not already been procured.  Again, if the Canadian Defendants find that they need a specific document or documents and the Panamanian government is unwilling to produce them, they should inform the Court immediately.[18]

The Canadian Defendants next argue that judicial efficiency will not be served if the case is heard in Galveston because (1) applying foreign law in U.S. courts is burdensome; and (2) all issues cannot be resolved in Texas.  The Canadian Defendants assert that either Panamanian law or Canadian law will apply, though they do not offer any choice of law analysis to buttress this assertion.  Plaintiffs do not address the issue of which law applies at all.  The Court thus considers the fact that it may be required to apply foreign law as a minor inefficiency resulting from the retention of this case.  Moreover, such an assertion is slightly patronizing.  This Court has an enormous admiralty docket and routinely addresses cases involving international contacts.  It is therefore adequately experienced to properly address any such requirements in this case.

The Canadian Defendants argue vehemently that the "greatest inefficiency occurs in the fact that" it would be "deprived of the chance to file a Third-Party Petition [sic] against ION, its staff, and Plaintiffs' physicians," which would result "in a terrible injustice to [the Canadian Defendants] who at best will have to litigate the issues twice."  MDS, Inc.'s Mot. to Dismiss for Lack of Personal Jurisdiction at 14–15.  The Court takes this inefficiency into consideration, but it does not deem it as

---

[18]The Canadian Defendants also complain that the documents in Panama and the testimony of the Panamanian witnesses will have to be translated from Spanish to English if the trial is in Galveston.  The Court submits that, since Defendants are either Canadian or Missourian, the documents would have to be translated, anyway.  Furthermore, many documents, as is evidenced by the exhibits already in the Court's possession, have already been translated.  And, since this Court's civil and criminal dockets often involve Hispanic parties or witnesses, Spanish translation is a common occurrence in the Court's proceedings.

sufficient enough to render its exercise of jurisdiction as a violation of the Canadian Defendants' due process rights when it is weighed against Plaintiff's interest in obtaining convenient and effective relief. As discussed extensively above in the section discussing whether exercising jurisdiction over MSIC offended traditional notions of fair play and substantial justice, Plaintiffs have an unusually strong interest in obtaining any justice to which they are entitled as quickly as possible, and they have waited long enough.

Thus, because MDS, Inc. and MDS (Canada), Inc. have sufficient minimum contacts with this forum and because, on balance, the exercise of *in personam* jurisdiction does not offend traditional notions of fair play and substantial justice, MDS, Inc.'s, MDS (Canada), Inc.'s, and MDS Nordion, Inc.'s Motions to Dismiss for Lack of Personal Jurisdiction are **DENIED**.

   *5. Service of Process*

The Canadian Defendants next argue that service of process, which was accomplished by serving the Texas Secretary of State, was improper. The Canadian Defendants allege that such service was improper because Plaintiffs' Complaint alleges that this case arises out of the Canadian Defendants' business contacts with Texas. *See* Pls.' First Am. Compl. ¶¶ 1.4–1.6. Under the Texas Civil Practices and Remedies Code, if a suit arises out of business a nonresident does in Texas and the nonresident has not designated an agent, the Texas Secretary of State is an agent for service of process. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.044(b) (Vernon 1997). The Canadian Defendants allege that, since the suit did not arise out of any of its activities within Texas, the Secretary of State is not an agent for service of process. However, Texas Civil Practices and Remedies Code § 17.044(a) allows for service of process upon the Secretary of State if the defendant "engages in business in this state, but has not designated or maintained a resident agent for service

44

of process." *Id.* § 17.044(a).  Plaintiffs' pleadings assert that "service of process is to be made

pursuant to Tex. Civ. Prac. & Rem. Code § 17.044 by serving the Secretary of State of Texas.".  Pls.'

First Am. Compl. ¶¶ 1.4–1.6.  Since § 17.044(a) is encompassed in § 17.044, and under § 17.044

service of process upon the Secretary of State is a sufficient means of serving a business over which

the Court may exercise general jurisdiction, service upon the Texas Secretary of State was proper.

MDS Nordion, Inc.'s, MDS, Inc.'s, and MDS (Canada), Inc.'s Motions to Dismiss for Improper

Service of Process are **DENIED**.

   *6. Venue*

   The Canadian Defendants' final argument that the Court should dismiss this case is that the

Southern District of Texas is an improper venue.  The gist of their argument is that this venue is

inappropriate because the Court may not maintain personal jurisdiction over any of the defendants.

*See* MDS, Inc.'s Mot. to Dismiss for Lack of Personal Jurisdiction at 18.  The Court has determined

that it may exercise general jurisdiction over all of the defendants, so MDS Nordion, Inc.'s, MDS,

Inc.'s, and MDS (Canada), Inc.'s Motions to Dismiss for Improper Venue are **DENIED**.

**IV.  Forum non Conveniens**

*A.  Legal Standard*

   The doctrine of *forum non conveniens* derives from the proposition that "[i]n rare

circumstances, federal courts can relinquish their jurisdiction in favor of another forum."

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 722, 116 S. Ct. 1712, 1724, 135 L. Ed. 2d 1 (1996).

Pursuant to this doctrine, a court may dismiss a case in favor of a foreign forum if the defendant

establishes that the convenience of the parties and the Court, coupled with the interests of justice,

indicate that the lawsuit is better suited for adjudication elsewhere.  *See Karim*, 265 F.3d at 268 (5th

Cir. 2001).

Federal courts employ a two-part analysis when applying the *forum non conveniens* doctrine. *See Piper Aircraft v. Reyno*, 454 U.S. 235, 255–56, 102 S. Ct. 252,265–66, 70 L. Ed. 2d 419 (1981). The first step involves a determination of whether an adequate and available foreign forum exists. *See Sydow v. Acheson & Co.*, 81 F. Supp. 2d 758, 768 (S. D. Tex. 2000).   Next, if an adequate alternative forum is available, the court must decide whether "certain private and public interest factors weigh in favor of dismissal." *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 424 (5th Cir. 2001).   If the relevant private interest factors advocate dismissal, however, no inquiry into the public interest factors in needed.   *See Baris v. Sulpicio Lines*, 932 F.2d 1540, 1550–51 (5th Cir. 1991). While undertaking both steps of this analysis, courts must remain mindful that "the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient." *Piper Aircraft*, 454 U.S. at 256, 102 S. Ct. at 266; *see also Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 827 (5th Cir. 1986).   The "*forum non conveniens* determination is committed to the sound discretion of the trial court." *Piper Aircraft*, 454 U.S. at 266 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511–12 (1947)).

The private factors to be considered in a *forum non conveniens* analysis relate to the convenience of the parties, and include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing, witnesses; possibility of viewing [the] premises, if view would be appropriate to the action; and all other practical problems that make a trial of a case easy, expeditious, and inexpensive[;] . . .  enforceability of judgment . . . [; and whether] the plaintiff [has sought to] 'vex,' 'harass,' or 'oppress' the defendant.

*Karim,* 265 F.3d at 268 n.14 (citations omitted).   The "public interest" factors include: "administrative

difficulties; reasonableness of imposing jury duty on the people of the community; holding the trial in the view of those affected; and the local interest in having localized controversies decided at home." *Id.*

### B.  Analysis

Before discussing the public and private interest factors, the Court will determine whether the Canadian Defendants have met their threshold burden of showing that Panama is an adequate and available forum.  Generally, an alternative forum is available to the plaintiff when the foreign court can assert jurisdiction over the litigation sought to be dismissed.  *See Piper*, 454 U.S. at 254 n.22, 102 S. Ct. at 265 n.22 (citation omitted) ("Ordinarily, [the requirement] will be satisfied when the defendant is amenable to process in the other jurisdiction.").  The alternative forum is adequate as long as the parties will be treated fairly and will not be deprived of all remedies there.  *See Sydow*, 81 F. Supp. 2d at 768; *see also Piper*, 454 U.S. at 254 n.22, 102 S. Ct. at 265 n.22.

In the instant case, Plaintiffs claim that Panama is neither an adequate nor an available forum. First, they point to the dismissals in the Panamanian courts as evidence that the forum is not available. Defendants claim that the latest case was dismissed before they had a chance to submit to Panamanian jurisdiction, and they assert that, under Panamanian law, the courts may exercise jurisdiction if the defendant submits to it.  *See* Canadian Defs.' Mot. to Dismiss for Forum non Conveniens Ex. X & Ex. BB (providing translated copies of (1) the Panamanian Judicial Code sections 244, 247, 248, and 249, which allow Defendants to waive jurisdiction; and (2) the Panamanian Supreme Court decision in *Samsung Electronics Latino America v. Hamilton Bank N.A.*, in which the Panamanian Supreme Court set out the basis and method of waiving jurisdiction ("[I]t is the defendant who has to decline or accept the expansion of the competence made by the plaintiff party, according to the dispositions

of the article 249 and 717 of the Judicial Code.")).  It is clear that Defendants did not have the opportunity to submit to Panamanian jurisdiction in the Panamanian judicial district in which the tort allegedly occurred, so the Court finds that the previous Panamanian dismissals do not render Panama an unavailable forum.

Panama is, however, an unavailable forum *at this time*.  In 2006, the Panamanian National Assembly passed a statute that deprives Panamanian courts of jurisdiction over cases filed in foreign countries that have been dismissed under the doctrine of *forum non conveniens*. *See* Pls.' Resp. to Canadian Defs.' Mot. to Dismiss for Forum non Conveniens at 8 (setting forth Panamanian National Assembly Law No. 32, Chapter IV, Section 1, Article 1421-J).  The new law requires Panamanian courts to "'reject[] ex officio by reason of incompetence'" any "'[l]awsuits that are brought in the country as a result of a foreign judgment of *forum non conveniens*.'" *Id.* (quoting the law).  The Canadian Defendants argue that the statute has been appealed as being in violation of the Panamanian Constitution, and they cite an Opinion by the Attorney General for the Republic of Panama in which he requests that the Panamanian Supreme Court find the statute unconstitutional.  The Canadian Defendants, who bear the burden of persuasion, have not presented the Court with any evidence regarding the weight of a Panamanian Attorney General Opinion.  The Court cannot base its opinion regarding Panama's availability on the supposition that the law depriving Panamanian courts of jurisdiction over cases that were dismissed in other countries under the doctrine of *forum non conveniens might* be held unconstitutional by the Panamanian Supreme Court.

The Canadian Defendants assert that, even if the statute disallowing Panamanian courts to exercise jurisdiction were viable, it would not be an issue because they have agreed to submit to the jurisdiction of the Panamanian courts, which is allowed under the aforementioned sections of the

Panamanian Judicial Code.  While this is an interesting argument, it is not persuasive.  At best, this scenario presents a conflict of two statutory provisions, and the Canadian Defendants have presented the Court with no expert testimony indicating that, in such circumstances, the conflict would be resolved in favor of the Judicial Code sections that allow for the expansion of jurisdiction, especially in the face of the clearly contrary 2006 statute.  Again, the Court cannot dismiss this case based on the *possibility* that the Panamanian courts may determine that the statutory conflict should be resolved in favor of maintaining jurisdiction over defendants who have waived the jurisdictional issue. Therefore, at the present time, the Court finds that Panama is not an available forum.[19]

---

[19]Plaintiffs claim that Panama is not an adequate forum because the Panamanian judicial system is corrupt and there is no possibility of having their case heard by a foreign court in a timely fashion. *See Bhatndger v. Surrendra Overseas, Ltd.*, 52 F.3d 1220, 1226–28,  (3d Cir. 1995) (finding that, at the time, India was not an available forum because it would take fifteen to twenty years for Calcutta's High Court to resolve it).  Plaintiffs support this allegation with a report from the U.S. Department of State that discusses the business communities' lack of confidence in the Panamanian judicial system. *See* U.S. Dep't of State, Doing Business in Panama: A Country Commercial Guide for U.S. Companies (2006) (attached as Ex. 3 to Pls.' Resp. to Canadian Defs.' Mot. to Dismiss for Forum non Conveniens).  The Report claims that

> When disputes with foreign investors arise, as they do from time to time, the investors often choose not to pursue remedies available to them via the court system.  In a few cases the appearance of corruption has been so widely accepted as to constitute conventional wisdom.  The decision by investors to avoid the court system is understandable, given the massive case backlogs and the spector of corruption.

*Id.*  The Canadian Defendants claim that Plaintiffs cannot rely on the Report because, as observed by this Court in *Gonzales v. P.T. Pelangi Niagra Mitra International*, "as a general matter, the adequacy  or inadequacy of a forum should be established by expert affidavits." *Gonzales v. P.T. Pelangi Niagra Mitra Int'l*, 196 F. Supp. 2d 482, 488 n.5 (S.D. Texas 2002). Plaintiffs, citing *Bridgeway Corp. v. Citibank*, a Second Circuit case, claim that reports from the U.S. Department of State may be taken into account when considering the issue of forum adequacy. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142–44 (2d Cir. 2000) (finding a U.S. Department of State Country Report on Liberia admissible under Rule 803(8)).  The Court agrees with both Parties.  *Generally*, expert affidavits should be submitted regarding the adequacy of a forum.  However, the U.S. Department of State Country Report cited here, like the Liberian Country Report in *Bridgeway Corp.*, is a dependable source of evidence under Rule 803. *See* Fed. R. Evid. 803(8)(C) (setting forth a hearsay exception in civil actions when the factual

Since the availability of the foreign forum in a threshold issue in a *forum non conveniens* analysis and the Court has determined that Panama is not an available forum, there is no need to analyze whether the public and private factors favor retention.[20]   The Canadian Defendants' Motion to Dismiss for Forum non Conveniens is **DENIED**.

**V.   Conclusion**s

For the reasons comprehensively articulated above, MSIC's, MDS Nordion, Inc.'s, MDS, Inc.'s, and MDS (Canada), Inc.'s Motions to Dismiss for Res Judicata and Direct Estoppel are **DENIED**.  Likewise, MSIC's, MDS Nordion, Inc.'s, MDS, Inc.'s, and MDS (Canada), Inc.'s Motions to Dismiss for Lack of Personal Jurisdiction are **DENIED**.   Additionally, the Canadian Defendants' Motions to Dismiss for Improper Service of Process, Improper Venue, and Forum non Conveniens are **DENIED**.  Each Party to bear its own taxable costs, expenses, and attorneys' fees incurred herein to date.

---

findings at issue resulted "from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate a lack of trustworthiness"). Thus, Plaintiffs have presented evidence indicating that many business investors consider the Panamanian Judicial System to be corrupt and that there are "massive case backlogs" in Panama, but this evidence does not bear substantial weight because it is not buttressed by expert testimony.

[20]Although the Court finds it unnecessary to discuss the public and private factors, it notes that it has conducted an extensive review of the Record and that, even if Panama were an adequate and available forum, the public and private interest factors would weigh against a *forum non conveniens* dismissal.

**IT IS SO ORDERED**.

**DONE** this 30th day of April, 2007, at Galveston, Texas.


_____
Samuel B. Kent
United States District Judge